***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before former Deputy Commissioner DeLuca and the briefs and arguments of the parties. The appealing party has shown good grounds to reconsider the evidence and receive *Page 2 
new evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Hearing Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. It is stipulated that this has been a previously accepted claim and that all parties are properly before the Commission and that the Commission has jurisdiction over the parties and over the subject matter.
2. It is stipulated that the Plaintiff was out of work from December 5, 2006 through May 15, 2007. Plaintiff was paid weekly temporary total disability benefits in the amount of $607.81 per week during that time. Plaintiff returned to work on May 15, 2007 on a modified schedule of 4 hours per day. He progressed to full duty of 8 hour days and has continued to work since his return on May 15, 2007. During the time Plaintiff was not working full duty 8 hour days he received temporary partial disability benefits, which varied in amount. There is no dispute at this time concerning temporary total or temporary partial disability benefits owed to Plaintiff.
3. It is stipulated that the Defendants, with the exception of the medical treatment in dispute, have paid for all of Plaintiff's medical care and medically related expenses incurred with regard to the injury sustained on December 4, 2006.
4. The issue before the undersigned is whether Plaintiff's ongoing physical complaints are related to his injury of December 4, 2006, and whether Plaintiff is in need of any *Page 3 
further medical treatment as a result of that compensable injury.
5. Stipulated Exhibits 1-3 were entered into the record. Additionally, Plaintiff's motion to admit additional evidence dated March 17, 2010 is allowed, and additional medical records marked as Plaintiff's Exhibit 1 are admitted into the record.
 ***********
Based upon all of the competent evidence of record, the undersigned makes the following:
 FINDINGS OF FACT
1. Plaintiff was 46 years old as of the date of the hearing before the Deputy Commissioner. He became employed at Defendant's, Sanford, North Carolina facility in 1999 as a warm form operator. In that capacity, Plaintiff operated a machine which processed metal billets.
2. Plaintiff was injured on December 4, 2006 when a steel billet hit him on the head. The billet, which weighed approximately five pounds and measured four inches long, was tossed by a co-worker toward a bin but missed the bin and dropped from approximately ten feet above Plaintiff.
3. EMS was alerted following the accident, and the EMS report from December 4, 2006 shows that emergency technicians responded within three to four minutes of the call. Their records show that Plaintiff did not lose consciousness and that he suffered a one and one-half to two inch laceration to his head. Plaintiff was found to be alert and reactive, with normal physical findings. Plaintiff was then transported by ambulance to Central Carolina Hospital, where he was treated for an uncomplicated laceration to his scalp. No loss of consciousness was noted in these medical records. Plaintiff complained of headaches as well as neck and back pain. *Page 4 
Plaintiff underwent CT scans of his cervical spine, his head, his lumbar spine, and his knee, all of which were negative. Plaintiff was discharged from the hospital that same day.
4. Plaintiff followed-up with Carolina Pines Occupational Medicine on December 5, 2006, reporting a head trauma, headaches, and dizziness, as well as low back pain and left knee pain.
5. The day after his release from the hospital, on December 5, 2006, Plaintiff was referred to Dr. Valerie Barnwell, a family physician in Sanford, for further treatment. Dr. Barnwell has practiced family medicine since 1988 and is also Plaintiff's primary care physician. Dr. Barnwell treated Plaintiff for his complaints of headaches from December 5 through December 18, 2006, at which time she referred him to a neurologist for evaluation of his headaches. While Dr. Barnwell has continued to see Plaintiff regularly as a patient since December 2006, she has not treated him for his headaches. Instead, Dr. Barnwell referred Plaintiff to a neurologist for treatment of his complaints. When she was informed that Plaintiff was sent to Dr. Gualtieri, who specializes in the treatment of traumatic head injuries, she did not feel that this referral was inappropriate.
6. With respect to her initial evaluations of Plaintiff, Dr. Barnwell testified that her neurological examinations of Plaintiff were normal. However, she did no neuropsychiatric or other testing of Plaintiff. Plaintiff made no complaints to Dr. Barnwell concerning his treatment with Dr. Gualtieri until June 24, 2009. At that time, Plaintiff informed Dr. Barnwell that he was upset because Dr. Gualtieri informed him that he felt Plaintiff was exaggerating his symptoms. Plaintiff complained of no other improper treatment by Dr. Gualtieri. On June 29, 2009, Plaintiff asked Dr. Barnwell to refer him to neurologist, Bruce Solomon.
7. When asked whether she felt Plaintiff's reported headaches were due to his injury *Page 5 
at work, Dr. Barnwell testified that this was what Plaintiff had told her. When asked her opinion on this issue by Plaintiff's counsel, Dr. Barnwell testified that, "according to Mr. Leach, these headaches started after the December 2006 head injury." She further clarified this by stating that her assessment that Plaintiff was having headaches was based on his report of headaches, and based on these reports, she made the referral to Dr. Solomon, as Plaintiff requested.
8. Dr. Thomas Gualtieri began treating Plaintiff on January 8, 2007, approximately one month after his injury. Dr. Gualtieri is board certified in psychiatry. Since 1978, Dr. Gualtieri has practiced in the field of neuropsychiatry with greater than 60% of his medical practice focusing on the treatment of patients with brain injuries. The balance of his practice focuses on patients with general psychiatric problems. Dr. Gualtieri has treated over 1000 patients with traumatic brain injuries.
9. When Dr. Gualtieri first saw Plaintiff in January of 2007, he administered a number of cognitive and neurocognitive tests to determine Plaintiff's level of cognitive functioning. At this first visit, Plaintiff performed very poorly on the testing. Dr. Gualtieri opined that Plaintiff's performance on the testing was a little worse than he normally saw in patients with concussions, but he allowed that Plaintiff's performance was within the "range of possibility." Dr. Gualtieri opined, based on Plaintiff's first visit, that the Plaintiff had sustained a traumatic brain injury about a month ago at work and had post-concussive symptoms. He anticipated that Plaintiff would start to recover significantly in the next month or two, which he felt was reasonable for a relatively healthy young man with a concussion. Dr. Gualtieri recommended fairly simple medications in low doses to treat Plaintiff's headaches, irritability, and sleep disturbance.
10. In June of 2007, Dr. Gualtieri ordered a brain MRI due to Plaintiff's continued *Page 6 
complaints of headaches and new complaints of knee pain, and because Dr. Gualtieri did not feel Plaintiff was getting better as quickly as he had anticipated. The MRI was normal, and Dr. Gualtieri was unable to make any objective findings to explain Plaintiff's ongoing complaints.
11. By August of 2007, Dr. Gualtieri noted that Plaintiff continued to complain of symptoms and had shown no improvement. In addition, Plaintiff's neurocognitive testing scores were significantly worse in August 2007 as compared to his June 2007 scores. These factors, along with the fact that Plaintiff reported no improvement from the medications Dr. Gualtieri had prescribed, caused Dr. Gualtieri to consider the possibility that Plaintiff was exaggerating his symptoms.
12. Dr. Gualtieri continued to treat Plaintiff on a regular basis into 2009. At his February of 2009 visit, Plaintiff's questionnaire still rated all of his symptoms, including attention, memory, anxiety, panic, fatigue, and sleep, as severe. Dr. Gualtieri performed his last full evaluation of Plaintiff on June 2, 2009. Plaintiff again completed his questionnaire in a way which indicated that all of his symptoms were of maximum severity. With respect to cognitive testing in June of 2009, Dr. Gualtieri administered several tests to evaluate whether Plaintiff was malingering. As explained by Dr. Gualtieri, the test completed by Plaintiff in January of 2007 showed no signs of malingering. On the June of 2009 Test of Memory Malingering, Plaintiff scored a 36, which, according to Dr. Gualtieri, is "very, very suspicious." On other computerized tests, Plaintiff's scores had continued to decline over time, from a 37 to a 24, to a negative 16 in June of 2009. Dr. Gualtieri opined that there were numerous signs of invalidity on this testing and that Plaintiff's scores were largely invalid and strongly indicative of manipulation. Based on his two and one-half years of observation and testing of Plaintiff, Dr. Gualtieri opined "That [Plaintiff] had had a concussion, that he had had transient post-concussive *Page 7 
symptoms, but that he had subsequently tried to manipulate the system in hopes of some kind of gain, and that he had misrepresented his symptoms to us on numerous occasions."
13. Dr. Gualtieri testified that these opinions were expressed in both his medical records and his deposition testimony. He testified that Plaintiff has no permanent disability related to any injury at work, has no physical restrictions related to any injury, and is in no further need of any medical treatment or medication as a result of his incident at work. Dr. Gualtieri offered these opinions to a reasonable degree of medical certainty.
14. Dr. Gualtieri noted in his records from the June 2, 2009 visit that, after evaluating Plaintiff and informing Plaintiff that he was not going to recommend disability from work, Plaintiff became agitated, spoke clearly, and demonstrated none of his earlier symptoms. Plaintiff requested that Dr. Gualtieri remove him from work, and when Dr. Gualtieri declined to do so, Plaintiff indicated that he needed a new doctor. While Dr. Gualtieri noted in this record that Plaintiff should be followed by a primary care physician, he was very clear in his deposition that this referral was not related to Plaintiff's injury at work, but was necessary to monitor Plaintiff's general physical condition. Additionally, in response to the assertions by Plaintiff and Plaintiff's wife at hearing that Dr. Gualtieri mistreated Plaintiff or spoke to him inappropriately, Dr. Gualtieri vehemently denied that he ever mistreated Plaintiff in any way.
15. On September 3, 2009, Plaintiff was seen by Dr. Bruce Solomon, a board certified neurologist, for an evaluation at his own request. Approximately 5% of Dr. Solomon's private practice is devoted to the treatment of head injuries. As the director of rehabilitation at Moore Regional Hospital, 5 to 10 % of his involvement in that position concerns the treatment of patients with head injuries. In Dr. Solomon's words, he has seen a "smattering" of head injury patients over the years. Most of his neurology practice involves treatment of disease processes *Page 8 
and not traumatic injuries.
16. When Dr. Solomon first saw Plaintiff, Plaintiff was complaining of dizziness and headaches following an injury in December 2006. Plaintiff's physical examination, vital signs, and appearance were normal. His neurologic examination was also normal. Additionally, Plaintiff's attention, concentration, memory, cranial nerves, motor function, sensory function, reflexes, and gait were all normal. Based on the history provided by Plaintiff, Dr. Solomon concluded that Plaintiff had post-concussive syndrome and prescribed Plaintiff Topamax for headaches, Cymbalta, and multi-vitamins.
17. When Plaintiff returned to Dr. Solomon on October 6, 2009, Plaintiff was unimproved and had stopped taking the Cymbalta on his own. Dr. Solomon scheduled a follow up visit in three months.
18. Dr. Solomon performed a cursory review of Dr. Gualtieri's records. When asked at his deposition if he felt that Dr. Gualtieri's mental status testing of Plaintiff was appropriate, he agreed that it was appropriate and relevant to determine a patient's condition. Dr. Solomon did not perform any cognitive or other mental status testing on Plaintiff. According to Dr. Solomon, Plaintiff was not complaining of any cognitive deficits. Plaintiff was only complaining of dizziness and headaches. Dr. Solomon testified that during his treatment of Plaintiff, Plaintiff had no problems with attention, concentration, orientation, or memory. Dr. Solomon testified that Plaintiff's complaints to Dr. Gualtieri, in June of 2009, as shown in the cognitive tests performed on that date, of attention, memory, anxiety, fatigue, and other similar problems, were inconsistent with his complaints to Dr. Solomon, as none of those issues were included in Plaintiff's primary or secondary complaints.
19. The questionnaire which Plaintiff completed for Dr. Solomon at his first visit in *Page 9 
September of 2009, in which Plaintiff complained of a large multitude of symptoms, was, according to Dr. Solomon, inconsistent with Plaintiff's actual bedside complaints to Dr. Solomon. Dr. Solomon was unable to explain this large discrepancy between Plaintiff's written complaints and his verbal complaints.
20. Dr. Solomon testified that he reached the conclusion that Plaintiff suffered from post-concussive syndrome based solely on Plaintiff's reported injury and his subjective complaints of headaches and dizziness. Dr. Solomon made no objective findings to corroborate the diagnosis of post-concussive syndrome. Dr. Solomon also testified that he found it unusual that Plaintiff's complaints had continued for almost three years given his physical findings.
21. At the hearing before the Deputy Commissioner, Plaintiff testified that he felt his treatment with Dr. Solomon had helped him. Plaintiff clarified this statement by adding that he did not know how the treatment helped, only that it had helped. Dr. Solomon testified that, based on his evaluation of Plaintiff in September and October 2009, Plaintiff was not doing any better as of October of 2009, despite adjustments in his medication. By Plaintiff's report to Dr. Solomon, Plaintiff obtained no improvement in his headaches or dizziness from Dr. Solomon's treatment. Illustrative of this is the fact that Plaintiff called Dr. Solomon on November 13, 2009, and told Dr. Solomon that his headaches were no better and the medications were not helping. As a result, Dr. Solomon decided to try different medications and if those medications did not help, Dr. Solomon testified that he would probably tell Plaintiff that he could not help him. Finally, Dr. Solomon testified that he was accepting Plaintiff's complaints at face value, although it was possible that Plaintiff was exaggerating or embellishing his symptoms for disability reasons.
22. Following Dr. Solomon's deposition, Plaintiff returned to Dr. Solomon on *Page 10 
January 4, 2010. At this visit, Plaintiff complained that his headaches "are constant," and that he felt ill tempered and depressed. He complained that the medication was making him groggy. Plaintiff's physical and neurological examinations were still normal. Dr. Solomon noted that Plaintiff "still has litigation pending which may also confuse the issues." Dr. Solomon recommended some changes in medications.
23. Plaintiff was out of work from his injury from December 5, 2006 to May 15, 2007, during which time he was paid temporary total disability benefits. Plaintiff returned to work on May 15, 2007, on a modified schedule of four hours per day. He progressed to eight hour days, full duty, and has continued to work, without restrictions, at his regular job with GKN.
24. On March 3, 2011, the Full Commission issued an Order referring Plaintiff to a mutually agreed upon neuropsychiatrist for the purpose of conducting an assessment of Plaintiff's current condition and an assessment of his need for further medical treatment. Dr. John Barkenbus was identified as a neuropsychiatrist who could evaluate Plaintiff. Counsel for the parties mutually agreed to an evaluation of Plaintiff by Dr. Barkenbus.
25. On April 19, 2011, Dr. Barkenbus performed an IME of Plaintiff to assess Plaintiff's current condition and determine if Plaintiff was in need of further medical treatment as a result of his compensable injury. Prior to this evaluation, Dr. Barkenbus was provided with Plaintiff's complete medical records and neuropsychological testing data.
26. At the evaluation, Dr. Barkenbus took a history from Plaintiff and performed a physical examination. Although the physical examination revealed no objective abnormalities, Plaintiff exhibited exaggerated slowness when performing simple tasks. Dr. Barkenbus also performed neuropsychiatric testing. Plaintiff performed quite poorly on this testing. As a result, *Page 11 
Dr. Barkenbus offered the opinion that Plaintiff did not put forth a legitimate effort on the testing, that the test results were invalid as a result of Plaintiff's lack of effort, and that Plaintiff's responses were non-physiologic. On the Personality Assessment Inventory, Plaintiff's results demonstrated a deliberate effort to present himself in a negative manner, which Dr. Barkenbus felt was exaggerated.
27. Based on his review of Plaintiff's history, his examination of Plaintiff, and Plaintiff's neuropsychiatric test results, Dr. Barkenbus found that Plaintiff does not have any ongoing brain injury. He also found that Plaintiff's ongoing complaints are not a result of his compensable injury. Dr. Barkenbus testified that Plaintiff requires no further medical treatment related to any incident at work, that Plaintiff has reached maximum medical improvement as the result of any such incident, and that Plaintiff retains no permanent impairment or disability related to any compensable injury. Ultimately, Dr. Barkenbus testified that his findings were consistent with the findings of Dr. Gualtieri.
28. The Full Commission finds, based on the preponderance of the evidence in view of the entire record, and particularly the opinions of Dr Gualtieri and Dr. Barkenbus, that Plaintiff's head injury of December 4, 2006 has fully resolved and that Plaintiff retains no disability and has no physical restrictions related to that incident. As Plaintiff's injury has fully resolved, Plaintiff does not require any further medical treatment as a result of his December 4, 2006 accident.
29. The Full Commission finds, based on the preponderance of the evidence in view of the entire record, that Plaintiff's ongoing complaints of headaches and dizziness are not related to his December 4, 2006 accident.
 *********** *Page 12 
Based on the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On December 4, 2006, Plaintiff sustained an admittedly compensable injury by accident when a steel billet hit him on the head. However, Plaintiff has fully recovered from that injury and retains no disability related to that incident. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff does not require any further medical treatment as a result of the December 4, 2006 injury, as Plaintiff's injuries from that incident have fully resolved. N.C. Gen. Stat. § 97-25.
3. To the extent Plaintiff continues to complain of headaches and dizziness, those complaints are not related to any compensable injury. N.C. Gen. Stat. § 97-25.
 ***********
Based on the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Plaintiff's claim for additional benefits under the Workers' Compensation Act as a result of the incident of December 4, 2006 must be and is hereby DENIED.
2. Each side shall bear its own costs in this proceeding.
This the ___ day of August, 2011.
 S/___________________ LINDA CHEATHAM COMMISSIONER *Page 13 
CONCURRING:
 S/___________________ DANNY L. McDONALD COMMISSIONER
 S/_______________ TAMMY R. NANCE COMMISSIONER